**SIGNED THIS: March 31, 2015**

_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

In Re                                      )
                                           )          Case No. 11-91764
PREFERRED PROPERTY                         )
GROUP, LLC,                                )          Chapter 11
                                           )
                         Debtor.           )

## O P I N I O N

Before the Court is the Second Interim Application for Compensation and

Reimbursement of Expenses, filed by the Debtor's former attorneys, Crane,

Heyman, Simon, Welch & Clar, and the FDIC's objection thereto. Also before the

Court is a Motion for Order Directing Disgorgement, filed by the FDIC, seeking

disgorgement of all amounts previously paid to the Debtor's former attorneys. For

the reasons set forth herein, the Second Interim Application for Compensation and

Reimbursement of Expenses will be allowed in part. The Motion for Order Directing Disgorgement will be denied in its entirety.

## I. Factual and Procedural Background

Preferred Property Group, LLC ("Debtor") previously engaged in the ownership and management of commercial and residential real estate. The Debtor's properties, and the rents generated therefrom, were subject to mortgages and security interests held by several creditors. The Debtor filed for relief under Chapter 11 on September 27, 2011. Prior to the filing, the law firm of Crane, Heyman, Simon, Welch & Clar ("CHSWC") was paid a $40,000 retainer for its representation of the Debtor in the Chapter 11 case. Scott Clar and Jeffrey Dan are the attorneys of record for the law firm. On the date of the petition, an Emergency Motion for Authority to Use Cash Collateral and for Related Relief ("Cash Collateral Motion") was filed by the Debtor seeking authorization to use rental income to pay costs associated with maintaining its properties and the expenses incurred in the ordinary course of its business, "among other things." The motion drew objections from creditors with secured interests in the rental income, including the Debtor's largest creditor, Country Bank.

Country Bank held notes, mortgages, and assignments of rents on a number of properties, including: (a) 600 North Convent Avenue, Bourbonnais, Illinois;[1] (b) 360 Buckman Drive, Bourbonnais, Illinois; and (c) 920 Westwood

---

[1] There seems to be some confusion about the correct street number for the property, identified elsewhere as "650 North Convent." For purposes of this Opinion, any reference to either street address refers to the same commercial

Road, Kankakee, Illinois. In October 2011, Country Bank was closed, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as its receiver. The FDIC was substituted for Country Bank in this case and retained John Lipinsky, the attorney of record for Country Bank. The FDIC filed a proof of claim for $11,019,378.87 secured by the Debtor's properties, and consisting primarily of $7,190,948.55 owed on the note relating to the North Convent property.

The objections to the Cash Collateral Motion were initially resolved by agreed orders with the objecting creditors, including Country Bank. The interim order relating to Country Bank ("First Interim Cash Order") authorized the temporary use of its cash collateral for payment of expenses to the extent of expenditures set forth in "Exhibit A" to the Debtor's motion.[2] In the First Interim Cash Order, Country Bank was granted adequate protection in that the Debtor was required to maintain the property, continue insurance coverage, keep an accounting of business income and expenditures, and segregate Country Bank's cash collateral from other funds. The Debtor was also required to make the property and its records available for reasonable inspection, and to provide to Country Bank monthly expense reports and copies of the business operating reports sent to the United States Trustee ("UST"). In addition, Country Bank was to receive a replacement lien on the Debtor's property to the extent of its pre-

property located on North Convent.

[2] Exhibit A relates to the expenses for the property located at 601 N. Fifth Avenue, in which Country Bank does not have an interest. Exhibits B, E, F, and G to the Debtor's motion relate specifically to the expenses of properties subject to Country Bank's liens.

petition liens.

Final orders allowing the Debtor's use of cash collateral throughout the pendency of the Chapter 11 case were entered as to each creditor upon lapse of the initial interim orders, with the exception of Country Bank/FDIC. After stepping into the shoes of Country Bank, however, the FDIC did agree to allow the Debtor to use its cash collateral temporarily, and a Second Interim Cash Order was entered continuing the cash collateral arrangement under the same terms as the first order. Third, Fourth, Fifth, Sixth, and Seventh Interim Cash Orders were subsequently agreed to and entered, authorizing the use of cash collateral into June 2012.

In May 2012, the Debtor filed a Chapter 11 Plan and Disclosure Statement, which drew objections from the FDIC and other creditors. At a July hearing on the Plan and Disclosure Statement, the Debtor was ordered to file an amended disclosure statement. An Eighth Interim Cash Order was also entered by agreement authorizing use of the FDIC's cash collateral into September 2012.

In early August 2012, the Debtor's principal, Gregory Yates, and his son, Terrence Yates, were indicted on federal charges relating to their dealings with Country Bank. Shortly thereafter, the Debtor filed an Amended Plan and Amended Disclosure Statement and then a Second Amended Plan and Second Amended Disclosure Statement. The FDIC objected to the Second Amended Disclosure Statement, challenging its adequacy, citing the lack of information regarding the Debtor's financial condition, the Plan's treatment and classification of creditors, as well as the impact of the absolute priority rule. The FDIC also questioned the

effect that the criminal indictment of the Debtor's principal and his potential conviction would have on the Debtor's reorganization. A hearing on the Debtor's Second Amended Plan and Second Amended Disclosure Statement was scheduled for early October.

The FDIC then filed a Motion for Relief from Stay or, in the Alternative, to Dismiss the Case ("Motion for Stay Relief") and a renewed objection to the Debtor's use of cash collateral based on the Debtor's failure to comply with the reporting requirements in previous interim cash orders and an alleged lack of adequate protection. Both matters were set for the October hearing date. At the hearing, the FDIC's Motion for Stay Relief was continued by agreement of the parties, and a schedule was set giving both parties time to file briefs. The FDIC withdrew its objection to continued cash collateral use by the Debtor, and a Ninth Interim Cash Order was entered. The Ninth Interim Cash Order included a provision for $26,000 monthly adequate protection payments to be paid to the FDIC. In addition, a Third Amended Plan and Disclosure Statement were ordered to be filed. The matters were reset for hearing on December 13, 2012.

Following the October hearing, the Debtor filed a response to the FDIC's Motion for Stay Relief. The FDIC did not file a brief within the time set by the Court, and the Motion for Stay Relief was set for the December 13th hearing. In the meantime, the Debtor filed its Third Amended Plan and Third Amended Disclosure Statement, and an Application for Compensation for Scott R. Clar, Debtor's Attorney ("First Fee Application"), which were also set for the December hearing date. The First Fee Application sought approval of $93,812.50 in fees and

$2695 in expenses for the period beginning September 22, 2011, and ending October 30, 2012. The First Fee Application requested payment from available funds in the Chapter 11 case in the full amount of $96,507.50, less the $40,000 pre-petition retainer already held by CHSWC. No objections to the First Fee Application were filed by any party.

Several days before the December 13th hearing, the FDIC filed its brief in support of its Motion for Stay Relief. At the hearing, the Third Amended Disclosure Statement was tentatively approved, and the FDIC's Motion for Stay Relief was continued to the confirmation hearing date which was set for February 11, 2013. The continued interim use of cash collateral was allowed over the FDIC's objection through the February confirmation hearing upon terms consistent with the previous order. CHSWC's First Fee Application was approved without objection, except for the issue of how the fees would be paid, which was also continued to the confirmation hearing date.

Following the December hearing, the Debtor filed a Motion for Authority to Use Cash Collateral to Pay Allowed Administrative Claim, seeking authority to pay the approved interim attorney fees from the cash collateral of the FDIC. The FDIC filed a motion and then an Amended Motion to Appoint Chapter 11 Trustee. These new motions were added to the February hearing date. Written objections to the Third Amended Plan were filed by a number of parties, including the FDIC. But then on February 4, 2013, a joint motion was filed by the Debtor, Centrue Bank, and the Unsecured Creditors Committee ("Committee") asking to continue all matters set for the February date, with the exception of the Debtor's Motion for

Authority to Use Cash Collateral to Pay Allowed Administrative Claim. An order allowing the joint motion was entered without hearing, and the Debtor's Third Amended Plan, the FDIC's Motion for Stay Relief, and the FDIC's Amended Motion to Appoint Trustee were reset for hearing on March 14, 2013.

The February 11th hearing on matters relating to the Debtor's use of cash collateral was held as scheduled. The FDIC filed an objection to the Debtor's Motion for Authority to Use Cash Collateral to Pay Allowed Administrative Claim, and that matter was continued for further hearing to March 20th. At the request of the FDIC, the matters relating to plan confirmation and the pending motions for stay relief and appointment of a trustee were also continued to March 20th and 21st. Finally, an interim agreed order on the Debtor's continued temporary use of cash collateral was requested, but the Eleventh Interim Cash Order states that it is being entered over the objection of the FDIC.

A second joint motion to continue all matters set for the March hearing was filed by the Debtor, Centrue Bank, and the Committee, stating that the FDIC had recently requested extensive discovery and that there was not enough time to fully and adequately respond or object before the confirmation hearing date. The motion was granted without a hearing, and the matters were continued to May 2013. A third motion to continue was later filed by the Debtor, with the apparent support of Centrue Bank and the Committee, stating that the Debtor was in negotiations with a prospective purchaser for the North Convent property and was working with the FDIC on effectuating a sale. The Debtor's motion was granted without hearing, and the Third Amended Plan, Motion for Stay Relief, Amended

Motion to Appoint Trustee, and cash collateral motions were continued to July 24th and 25th.

In June 2013, the FDIC filed a Motion to Convert Case From Chapter 11 to Chapter 7 ("Motion to Convert"), which was set for hearing on July 15, 2013. The Debtor objected to the FDIC's motion and filed a Fourth Amended Plan and Disclosure Statement, as well as a Second Motion for Authority to Use Cash Collateral to Pay Allowed Administrative Claim, which were set for the July 24th hearing date.

At the July 15th hearing on the FDIC's Motion to Convert, several other matters were taken up as well. At that time, the Debtor's Motion for Authority to Use Cash Collateral to Pay Allowed Administrative Claim was allowed over the FDIC's objection that it was not set for that date, and an order allowing payment of the previously approved attorney fees from the cash collateral of the FDIC was subsequently entered. The FDIC's Amended Motion to Appoint Trustee and the other matters set for July 24th were continued to October by agreement. The Court also continued the FDIC's Motion to Convert over its objection, declining to accept the FDIC's argument that the stay terminated automatically because a final hearing had not yet been held, ruling instead that the stay continued in place and effect. An Omnibus Order and an Amended Omnibus Order were later entered, continuing all pending matters to October, and acknowledging the continued effect of the automatic stay. A Twelfth Interim Cash Order was also entered, allowing the continued use of cash collateral by the Debtor through October. A Fifth Amended Plan and Disclosure Statement were filed thereafter, and an order was entered

–8–

approving the Fifth Amended Disclosure Statement and fixing times for balloting and objecting to confirmation of the Fifth Amended Plan.

Following the July hearing, the FDIC filed an appeal to the District Court, challenging a number of orders entered by the Bankruptcy Court, including: (1) the Order Allowing Motion for Authority to Use Cash Collateral to Pay Allowed Administrative Claim; (2) the Omnibus and Amended Omnibus orders continuing a number of pending matters, including interim use of cash collateral, and acknowledging the continuing effect of the automatic stay; and (3) the Twelfth Interim Cash Order. The Notice of Appeal filed in the Bankruptcy Court named the FDIC, the UST, the Committee, and the Debtor as the parties to the appeal. The FDIC also filed a motion asking the Court to stay all matters related to the orders or confirmation of any proposed plan pending its appeal to the District Court. A hearing on the stay request was held in August, and the Court denied the motion. The FDIC then also appealed that order, but later voluntarily dismissed the appeal.

In September 2013, while the appeal from the July orders was pending, the Debtor agreed to the appointment of a trustee. Mr. Clar then filed a Second Application for Compensation and Reimbursement of Expenses ("Second Fee Application"). The Second Fee Application sought allowance of interim fees and expenses of $136,498.50 and $2978.62, respectively, for the period beginning November 1, 2012, and ending August 6, 2013. The Second Fee Application drew objections from the UST and the FDIC.

Roger Stone was appointed Chapter 11 Trustee ("Trustee"). Shortly after his

appointment, the Trustee entered into an agreement with the FDIC allowing the continued interim use of the FDIC's cash collateral under terms substantially similar to the previous cash collateral orders with the Debtor, but also specifically authorizing use of the cash collateral to pay the Trustee's fees and expenses. The Trustee withdrew the Debtor's Fifth Amended Plan and Fifth Amended Disclosure Statement, as well as other pending motions filed by the Debtor, and he objected to the Second Fee Application. In January 2014, a second agreed order authorizing the Trustee's interim use of the FDIC's cash collateral was entered.

In February 2014, the FDIC's appeal was resolved by an Order Approving Joint Stipulation Between Chapter 11 Trustee and Federal Deposit Insurance Corporation, as Receiver for Country Bank, Regarding Issues on Appeal ("Stipulated Order on Appeal"). The Joint Stipulation, signed only by the FDIC and the Trustee, stated that the Debtor did not have standing to participate in the appeal after the appointment of the Trustee, who they agreed was the only party in interest opposite the FDIC. The Joint Stipulation also provided that the automatic stay terminated as to the FDIC on November 10, 2012, as a matter of law pursuant to 11 U.S.C. §362(e)(1). The Trustee and the FDIC also agreed to dismiss all remaining issues on appeal relating to cash collateral "without prejudice to the right of the Trustee or FDIC-Receiver to (a) object to all applications for final orders allowing, or authorizing payment of, professional fees and expenses for Debtor's counsel, [CHSWC], and (b) seek disgorgement of all professional fees and expenses paid to Debtor's counsel on an interim basis[.]" The Joint Stipulation further stated that the FDIC was withdrawing its appeal relating

to its motion to convert. Based on the Joint Stipulation, the District Court dismissed the FDIC's appeal.

Following resolution of the appeal, the Trustee filed a motion to sell property free and clear of all interests ("Sale Motion"). The Sale Motion sought to sell the North Convent property, which provided security for the majority of the FDIC's claim.[3] Concluding that the secured claims exceeded the value of the property, the Trustee had determined that it was in the best interests of the estate to reach an agreement with the FDIC that would yield a dividend for general creditors. The agreement, as set forth in the Sale Motion, provides that the FDIC would consent to a sale for a gross purchase price of not less than $4,000,000, and a carve out from the FDIC's cash collateral of $125,000 for payment of the Trustee's fees. The FDIC would, further, "release its lien on the Debtor's remaining cash collateral arising from the Real Estate with the exception of the FDIC's interest in funds previously paid to Debtor's counsel for professional fees and expenses, provided FDIC receives not less than $4,000,000.00 pursuant to a sale from a combination of net proceeds of sale and cash collateral[,]" and would "waive any deficiency claim, subject to FDIC's reservation of interest in funds previously paid to Debtor's counsel." In addition, the FDIC would receive 40% of any proceeds brought by the sale in excess of $4,000,000, with the remainder being distributed to the estate.

Elsewhere in the Sale Motion, additional reference was made to the FDIC releasing its lien on cash collateral, stating in paragraph 13 that it is "subject only

---

[3] The properties located at 360 Buckman Drive, Bourbonnais, Illinois, and 920 Westwood Road, Kankakee, Illinois, were previously surrendered by the Debtor.

to a reservation of rights as to cash collateral paid to Debtor's counsel[,]" and in paragraph 18 that "the FDIC has not released its interest in any cash collateral used to pay the professional fees and expenses of the Debtor's counsel."

The Sale Motion was granted by an order entered on May 28, 2014 ("Sale Order"), restating the terms of the agreement between the FDIC and the Trustee. As to the agreement, the Sale Order provides that the FDIC "releases its lien on the Debtor's remaining cash collateral arising from the Real Estate with the exception of the FDIC's interest in funds previously paid to Debtor's counsel for professional fees and expenses, . . . and . . . waives any deficiency claim, subject to FDIC's reservation of interest in funds previously paid to Debtor's counsel[.]"

A status hearing was set for June 11, 2014, on all pending matters.[4] The day before the hearing, the FDIC filed a motion seeking disgorgement of the fees of Mr. Clar and CHSWC ("Disgorgement Motion") in the amount of $96,000 that had previously been approved on an interim basis. The Disgorgement Motion was set for status with the other matters.

At the hearing, the Court set the Disgorgement Motion and the Second Fee Application and objections for evidentiary hearing on September 17, 2014. As to the Debtor's original Cash Collateral Motion, which had been pending since the petition date and subject to numerous interim orders, the FDIC's attorney stated

---

[4] This case was previously assigned to Judge Gerald Fines of the Danville Division of the Central District of Illinois. On May 31, 2014, Judge Fines retired and the Danville Division cases were reassigned. The June 11, 2014, hearing was the first conducted by this Court. Issuance of this Opinion has been delayed, at least in part, due to the fact that this Court has spent extensive time reviewing volumes of documents and listening to recordings of hearings conducted by Judge Fines during the first three years the case was pending.

that an agreed final order with the Trustee was anticipated, pending the completion of the sale of the North Convent property. He explained that, assuming the sale would close by the end of June, the "FDIC will be releasing its lien in the cash. So there will be no need for cash collateral orders after that[.] . . . The only lien that we will retain is in the cash that was paid to Mr. Clar's firm." At that time, the Court expressed concern regarding the FDIC's standing on the fee matters. The FDIC's attorney claimed it has an interest in litigating the matters because the fees represent roughly $100,000 of its money that it would get back if the Court ordered disgorgement. The Cash Collateral Motion was continued to July 9, 2014, pending completion of the sale.

At the July hearing, the Trustee informed the Court that the sale of the property had closed, and the FDIC was willing to go forward with an agreed entry releasing its cash collateral and resolving the original Cash Collateral Motion. The FDIC's attorney agreed, but noted the exception that it "retain [its] lien in the cash collateral pursuant to the payments that were made to the Debtor's counsel." The sale and settlement already having been executed by himself and the FDIC, the Trustee expressed that he merely wanted to affirmatively resolve the issue of cash collateral use with a final order.

The Trustee and the FDIC filed a Third Stipulation for Final Order Authorizing Continued Use of Cash Collateral of the FDIC, and the Court entered an order approving the Third Stipulation on July 18, 2014 ("Final Cash Order"). As with the prior stipulations in the Sale Motion and Sale Order, the agreement attached to the Final Cash Order provides that the FDIC release its lien on all

cash collateral with the exception of cash "used for payment of professional fees and expenses for Debtor's counsel." But the stipulation in the Final Cash Order also provides that, "the Trustee agrees that the FDIC shall be entitled to continue to object to all applications for final allowance and payment of professional fees and expenses by Debtor's counsel and to seek disgorgement of all professional fees and expenses authorized to be paid on an interim basis." The agreement further states that the FDIC "waives all deficiency claims against the Debtor and agrees that it shall not receive any additional funds in the bankruptcy estate except as it pertains to professional fees and expenses paid to Debtor's counsel which the Court orders to be disgorged or otherwise reimbursed to the Debtor's bankruptcy estate[,]" which "shall be retained by the Trustee pending further order of the Court."

Prior to the evidentiary hearing on the Disgorgement Motion and the Second Fee Application, a number of related motions were filed, including a request for continuance, which were set for hearing on September 10, 2014. At that time, the Court denied the motion to continue and again noted its concerns regarding the FDIC's standing in light of its settlement with the Trustee. Given those concerns, the Court expressed its intention to hear arguments on the FDIC's standing as to its Disgorgement Motion and its objection to the Second Fee Application before taking any evidence on either matter.

Prior to the September 17th hearing, an Agreed Order Regarding Second Interim Fee Petition of CHSWC ("Agreed Fee Order") was entered based on the agreement of the Trustee, the UST, CHSWC, and the Committee. Through it, the

Trustee, the UST, and the Committee agreed not to seek disgorgement of fees already paid to CHSWC under the interim fee award. And to the extent that the FDIC succeeded in obtaining disgorgement of said fees, CHSWC agreed not to seek reimbursement of any such amounts from the estate. Finally, the parties agreed to the allowance of additional fees and expenses in the amount of $75,000 in settlement of both the Second Fee Application and a final fee request which had recently been filed. As such, CHSWC agreed to only seek final approval of the total award as agreed to by the settling parties.

The September 17th hearing took place as scheduled, but only on the FDIC's Disgorgement Motion and its objection to the Second Fee Application — the Agreed Fee Order having resolved all other objections. Prior to the hearing, the FDIC filed a supporting brief on its standing to proceed on the fee matters. In its brief, the FDIC argues that it has standing pursuant to its settlement with the Trustee set forth in the Sale Motion and Sale Order, whereby the FDIC retained its interest in cash collateral used for payment of fees and expenses to CHSWC and preserved its right to object to all fee applications and to seek disgorgement. And for the first time, the FDIC contends that any disgorgement should not go to the estate, but in fact should go directly to the FDIC, because the estate has already received the benefit of disgorgement through the settlement. The FDIC conceded, however, that it was only entitled to the disgorgement and return of $56,000 paid to CHSWC from its cash collateral. And finally, the FDIC argued that it had standing to object to the Second Fee Application because the fees could only be paid from the FDIC's unreleased cash collateral and would otherwise be subject

to disgorgement to the FDIC.

At the hearing, the FDIC's attorney reiterated the arguments raised in its brief, stating that the motion was brought for the benefit of the estate, a benefit previously received through the Trustee's settlement with the FDIC. The FDIC also maintained its position that it was still a creditor in the case. The FDIC claimed that it was entitled to the $56,000 paid to CHSWC on the First Fee Application, and, as also raised for the first time in its brief, any moneys that would be used to pay the fees of CHSWC going forward. Citing the language in the Third Stipulation underlying the Final Cash Order, the FDIC argued that the only plausible way to interpret the settlement with the Trustee is to recognize that the FDIC retains a lien on money in the estate that not only has been paid to CHSWC, but that may also be paid in the future. Because it has not released its liens over amounts paid or to be paid to CHSWC under future fee applications, the FDIC argues that it has standing to proceed on its Disgorgement Motion and its objection to the Second Fee Application.

CHSWC argued that the FDIC did not have standing to object to the firm's Second Fee Application in light of the sale of the North Convent property and the settlement with the Trustee in connection with the sale. Specifically, CHSWC argued that because the FDIC released its liens on the remaining cash collateral held by the estate in settling with the Trustee, it is no longer a creditor in the case and has no control over how funds from the estate are distributed. And irrespective of any additional rights retained by the settlement, CHSWC argued that the agreement could not create rights in the FDIC that did not otherwise

exist. CHSWC incorporated those arguments into its argument on the Disgorgement Motion, and further argued that a motion for disgorgement is property of the estate, and the only party with standing to seek such relief is the Trustee. CHSWC argued that, even if the right to seek disgorgement could be conferred upon another party in interest, the motion must be brought on behalf of the estate or for the benefit thereof, none of which applies to the FDIC here. Finally, CHSWC argued that the FDIC waived the issue of using cash collateral to pay attorney fees when it dismissed its appeal of various rulings, including the order authorizing use of cash collateral to pay CHSWC's fees.

After taking arguments from all parties on the FDIC's standing to proceed with its Disgorgement Motion and objection to the Second Fee Application, the Court took the matters under advisement.

## II. Jurisdiction

This Court has jurisdiction over the issues presented here pursuant to 28 U.S.C. §1334. The matters before the Court are core proceedings. *See* 28 U.S.C. §157(b)(2)(A), (B), (O).

## III. Legal Analysis

### A. The Law of Standing and Cash Collateral

The issues before the Court can be decided in large measure based on a lack of standing by the FDIC to continue to participate in this case, at least as to the issues presented here. The FDIC's assertion of standing is premised on its interest

in cash collateral generated during the pendency of the case. A brief preliminary discussion of both legal issues will aid in resolution of the pending matters.

### 1. Standing

Standing is generally discussed in the context of either constitutional standing or prudential standing. Standing in the constitutional sense is an element of the "case or controversy" requirement of Article III of the Constitution. To have this type of standing, a litigant must show: (1) that he has suffered an injury in fact, (2) that the injury is fairly traceable to the defendant's conduct, and (3) that the injury is likely to be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

An "injury in fact" refers to the invasion of a legally protected interest which is both concrete and personal to the injured person and is actual or imminent rather than hypothetical or speculative. *Id.* at 560. To say that the injury is "fairly traceable to the defendant's conduct" means in part that the injury must not be the product of some independent action taken by a third party that is not before the court. *Id.* at 560-61. Self-inflicted harm does not confer standing because it does not qualify as an injury in the Article III sense and, more importantly, because it is not traceable to the defendant's conduct. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No State can be heard to complain about damage inflicted by its own hand."); *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 518 (7th Cir. 2010). The notion of "redressability" means that it must be likely, and not just conceivable, that the injury will be remedied by a favorable

decision. *Lujan*, 504 U.S. at 561.

The concept of prudential standing is grounded not in Article III of the Constitution but in "matters of judicial self-governance" designed to guarantee that courts only resolve disputes that are appropriate for judicial resolution. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). One prudential limitation on standing is that a party generally may not assert the rights of another person or entity. *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 294 (7th Cir. 2000).

A prudential limitation on standing, unlike constitutional standing, is subject to waiver and is not jurisdictional. *RK Co. v. See*, 622 F.3d 846, 851-52 (7th Cir. 2010); *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 756-57 (7th Cir. 2008). It is within the court's discretion whether to raise, *sua sponte*, questions about prudential standing. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 540 (7th Cir. 2012). Additionally, a court can consider questions of prudential standing even if the resolution of a constitutional standing issue is in doubt or unclear. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578, 585 (1999) (saying there is no "jurisdictional hierarchy" and that courts may "choose among threshold grounds for denying audience to a case on the merits"); *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 179 (D.C. Cir. 2012); *In re LimitNone, LLC*, 551 F.3d 572, 576-77 (7th Cir. 2008).

The party asserting standing has the burden of establishing its existence by a preponderance of the evidence. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998); *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999). The Article III standing requirement is a jurisdictional prerequisite to

reaching the merits of a suit. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009); *Smith v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1142 (7th Cir. 1994). Although standing is not dependent on the merits of the plaintiff's suit, it frequently turns on the nature and origin of the asserted claim. *Warth*, 422 U.S. at 500.

### 2. Cash Collateral

Although a trustee or Chapter 11 debtor may generally use property of the estate in the ordinary course of business without first giving notice to creditors or seeking court approval, stricter rules apply when the property being used is "cash collateral." 11 U.S.C. §363(c). "Cash collateral" includes "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents" in which both the estate and another entity — usually a creditor — have an interest. 11 U.S.C. §363(a). A trustee or Chapter 11 debtor may only use cash collateral with the consent of the entity having an interest in the collateral or upon court approval. 11 U.S.C. §363(c)(2).

If the creditor does not consent to the use of cash collateral, a motion seeking court authorization for the use must be filed. Notice of the motion and an opportunity to be heard must be given to any entity that has an interest in the cash collateral. Fed. R. Bankr. P. 4001(b); 11 U.S.C. §§102(1), 363(c)(2)(B). An initial hearing may be held on short notice, but a final hearing to consider authorizing the use of cash collateral may not be held on less than fourteen days notice. Fed. R. Bankr. P. 4001(b)(2). Frequently, one or more interim orders

authorizing the use of cash collateral are entered, by agreement or over a creditor's objection, in order to give interested parties an opportunity to sort through relevant issues prior to consideration of a final order.

In considering whether to authorize the use of cash collateral over the objection of an entity with an interest in the collateral, a court must determine whether that entity's interest is or can be adequately protected. 11 U.S.C. §363(c)(2), (e). Adequate protection may consist of cash payments, replacement liens, or any other relief which provides the entity with the "indubitable equivalent" of its interest in the cash collateral which is being used. 11 U.S.C. §361. Adequate protection may also exist for an oversecured creditor through an equity cushion. Although property acquired after the commencement of a case is generally not subject to pre-petition security interests, a security agreement which specifically includes post-petition rents is enforceable and extends to the cash collateral created by post-petition rent receipts. 11 U.S.C. §552(a), (b)(2). Debtors frequently establish separate bank accounts into which all cash collateral is deposited and segregated from other estate assets in order to facilitate accounting for the use of cash collateral throughout the pendency of a case. 11 U.S.C. §363(c)(4).

Although the use of cash collateral without consent or court order is prohibited, the Code provides no specific remedies for the unauthorized use or misuse of cash collateral. Case law provides remedies such as the appointment of an examiner or trustee, the denial of plan confirmation, the granting of stay relief, or the dismissal of a case. *See, e.g.*, *Cothran v. United States (In re Cothran)*,

45 B.R. 836, 837-39 (S.D. Ga. 1984) (plan confirmation denied and case dismissed where cash collateral sales proceeds were spent without authorization); *In re Lafayette Dial, Inc.,* 92 B.R. 798, 800-02 (Bankr. N.D. Ind. 1988) (stay relief granted when debtor failed to comply with cash collateral adequate protection order).

Whether orders authorizing the use of cash collateral are final orders for purposes of appeal is not a fully settled question. *See In re Bluejay Properties, LLC*, 512 B.R. 390, 2014 WL 948631, at *2 (B.A.P. 10th Cir. Mar. 12, 2014) (collecting cases). An order that "ends the litigation on the merits" is generally final and subject to appellate review. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712 (1996) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)). Because cash collateral orders authorize the expenditure of funds — and once the funds are spent they may not be recoverable from the debtor — such orders are frequently considered final by appellate courts without significant discussion of the issue. *See, e.g., In re Buttermilk Towne Center, LLC*, 442 B.R. 558, 559 (B.A.P. 6th Cir. 2010).

### B. The Disgorgement Motion.

The FDIC's Disgorgement Motion requested that the Debtor's attorneys, CHSWC, be ordered to disgorge $96,000 previously paid to them. That amount includes a $40,000 pre-petition retainer and $56,000 paid from the FDIC's cash collateral pursuant to an order entered July 17, 2013. In a memorandum of law filed the day before the hearing on the Disgorgement Motion, the FDIC limited its

requested disgorgement to the $56,000 paid post-petition. The Disgorgement Motion implies that any disgorgement required should run directly to the FDIC, although, elsewhere in the record, disgorgement of the fees to the estate is suggested.

Disgorgement of previously paid professional fees may be required when such compensation "exceeds the reasonable value" of the services rendered. 11 U.S.C. §329(b). Disgorged funds generally are returned to the estate but, under certain circumstances, may be returned to an entity that paid the professional fees. *Id.*; *Matz v. Hoseman,* 197 B.R. 635, 641 (N.D. Ill. 1996) (fees paid in Chapter 11 case are disgorged to Chapter 7 estate after conversion even when originally paid by authorized use of cash collateral). Although disgorgement may be required when a professional has breached fiduciary duties or otherwise acted wrongfully, a finding of misconduct is not necessary to order disgorgement. *In re Kids Creek Partners, L.P.*, 236 B.R. 871, 877 (Bankr. N.D. Ill. 1999); *In re Anolik*, 207 B.R. 34, 39-40 (Bankr. D. Mass. 1997). Disgorgement may be required when an estate is insolvent and insufficient funds are available to pay all administrative claims in full. *Id.*

The Disgorgement Motion relies on two separate and distinct grounds for the relief requested. The FDIC first claims that the order entered on July 17, 2013, authorizing payment of the Debtor's attorney fees with the FDIC's cash collateral was entered in error. Second, the FDIC asserts that CHSWC must be ordered to disgorge fees because its attorneys failed to fulfil their obligations in this case, breached their fiduciary duties, had conflicts of interest because of dual

representation of the Debtor and its principals, and provided incompetent representation. The grounds will be addressed separately.

### 1. The Cash Collateral Order Entered on July 17, 2013

The FDIC complains that the order entered on July 17, 2013, authorizing the use of cash collateral to pay the administrative claim of CHSWC for professional fees ("July 17th Order") was entered in error. The procedural history of the case as it relates to the entry of that order is confusing and bears repeating.

A number of interim cash collateral orders were entered throughout the pendency of the case pursuant to the Debtor's originally filed motion seeking authority to pay business expenses related to the Debtor's properties from the rents generated by the properties. Those orders provided no authority to use cash collateral to pay professional fees. After the First Fee Application was allowed, the Debtor filed a separate motion seeking authority to use the FDIC's cash collateral to pay the allowed fees. That motion was filed in December 2012, and the FDIC objected to it in writing on February 8, 2013. The Debtor then filed repeated requests to continue hearings on the motion and other matters which were set in February, March, and May 2013. In June 2013, the Debtor filed a second motion seeking authority to use the FDIC's cash collateral to pay the allowed fees of CHSWC. The Debtor noted that the second motion was "virtually identical" to the first motion. Because the first motion was already set for July 24, 2013, the second motion was set at the same time.

A hearing on a number of pending matters was held on July 15, 2013.

Although neither of the Debtor's motions seeking to use the FDIC's cash collateral to pay allowed fees was scheduled to be heard that day, the Debtor's attorney requested this Court's predecessor to take up the motions. Over the objection of the FDIC, the motions were heard and allowed with the written order being entered several days later.

The FDIC timely appealed the July 17th Order and other orders entered after the July 15th hearing to the District Court. The Debtor filed a motion in the District Court asking that the appeal be dismissed because the orders appealed from were interlocutory. The FDIC responded that the order which the bankruptcy court had entered after the July 15th hearing, finding that the automatic stay was in full force and effect, was a final order and, because the issuance of the cash collateral order was, in its view, premised on the fact that the stay remained in effect, the July 17th Order was also final and appealable. The FDIC also asserted in its response that, because the Trustee had been appointed, the Debtor no longer had standing to participate in the appeal. Attorney Scott Clar had, however, filed a separate entry of appearance and a Motion to Intervene on behalf of CHSWC in the District Court.

Notwithstanding Mr. Clar's appearance and the pending Motion to Intervene, the FDIC and the Trustee filed a Joint Stipulation with the District Court, which represented that they were the only parties in interest with respect to all matters on appeal. They stipulated that the automatic stay in the case had terminated as a matter of law as to the FDIC on November 10, 2012, and that the other issues raised by the appeal dealing with the use of cash collateral should be

dismissed without prejudice. They reserved for each other their respective rights to continue to object to fee applications of CHSWC and to seek disgorgement of fees already paid. The Joint Stipulation was attached to the Stipulated Order on Appeal prepared by the parties which approved the Joint Stipulation and remanded the case for further proceedings. The District Court also specifically ordered, by the agreement of the FDIC and the Trustee, that the Debtor's Motion to Dismiss and the Motion to Intervene of CHSWC were moot, although there is no indication in the record that Mr. Clar or CHSWC was given any notice before the order was entered. The Stipulated Order on Appeal did not vacate or otherwise modify the July 17th Order.

Based on this checkered history, the FDIC claims that it retains an interest in the $56,000 paid to CHSWC pursuant to the July 17th Order and that, notwithstanding the July 17th Order, this Court can order disgorgement on that basis alone. But the FDIC is wrong. As the record set forth above indicates, the July 17th Order remains in full force and effect. The use of cash collateral was authorized, and the payment to CHSWC cannot be called back based solely on the FDIC's ongoing complaint that the July 17th Order should not have been entered.

If the July 17th Order was final and appealable — as the FDIC argued to the District Court that it was — then the dismissal of the appeal without any modification of the July 17th Order ends the discussion. This Court cannot rehear the FDIC's arguments about whether the July 17th Order should have been entered in the first place. And to the extent that the FDIC relies on the Joint Stipulation it entered into with the Trustee to now bootstrap an argument that the

Stipulated Order on Appeal effectively modified the July 17th Order because the
District Court's order provided for termination of the stay on an effective date
before the July 17th Order was entered, that position must also be rejected.
Contrary to the FDIC's claim, the July 17th Order did not just automatically
become void when the District Court dismissed the appeal.

The Joint Stipulation and Stipulated Order on Appeal were drafted and
entered into by the FDIC and the Trustee alone. The Joint Stipulation correctly
cites to the provisions of the Code and Rules making the recently appointed
Trustee the representative of the estate. 11 U.S.C. §323; Fed. R. Bankr. P. 2012(a).
But the further representation made to the District Court that the FDIC and the
Trustee were the only parties in interest in the appeal was patently false.[5] The
appeal of the July 17th Order directly impacted and involved the rights of CHSWC.
If the intent of the Trustee and the FDIC was that the dismissal would

---

[5] The misrepresentation was not only patently false, it was intentional. The
FDIC and the Trustee agreed on February 10, 2014, to represent to the District
Court that all issues on appeal "belong to the Trustee" with the express intent of
defeating efforts by Mr. Clar to advance his firm's interests as a claimant in the
appeal. The agreement was memorialized in a "Settlement Letter" drafted by John
Lipinsky for the FDIC and agreed to by the Trustee's attorney. The Settlement
Letter is marked as "Confidential & For Settlement Purposes Only" and states that
its contents are protected by Rule 408 of the Federal Rules of Evidence.
Nevertheless, Mr. Lipinsky attached the Settlement Letter to his memorandum
filed in support of the FDIC's Disgorgement Motion on September 16, 2014, and
the Trustee made no objection to the disclosure. As will be explained elsewhere,
the Court cannot consider the terms of the Settlement Letter to modify the
compromise actually presented to and approved by this Court's predecessor as the
FDIC asks the Court to do. But the tenor of the Settlement Letter and the
intentions of the FDIC and Trustee as expressed therein do add context to the
matters now before this Court and can properly be considered in that limited
regard.

automatically void the July 17th Order, they should have said so at the time, and they should have been honest with the District Court that the impact of such an order would directly affect the rights of CHSWC who was not a party to the Stipulated Order on Appeal.[6]

Likewise, the reservation of rights in the Joint Stipulation does no more than reserve whatever rights the parties already had. There is no fair reading of the Joint Stipulation or the Stipulated Order on Appeal that would suggest that either document created new rights for the FDIC in derogation of the rights of CHSWC without an opportunity for CHSWC to be heard. Further, the suggestion that the District Court prejudged and approved the standing of the FDIC to bring a motion before this Court which had yet to even be filed is simply wrong.

If the July 17th Order was final and appealable, it should have been appealed, and the FDIC should have pursued a ruling from the District Court after fair notice and an opportunity to be heard was afforded to the actual party in interest, CHSWC. If the July 17th Order was not final, then the FDIC may, if it chooses, go back to the District Court and ask for review when it believes the July

---

[6] The FDIC and the Trustee agreed in their Joint Stipulation and Stipulated Order on Appeal that the stay was modified as to the FDIC effective November 10, 2012. But their actual agreement, evidenced by the Settlement Letter, was that the FDIC "would forebear from exercising any of its rights due to the stay being terminated until June 30, 2014[.]" Thus, the FDIC obtained relief from stay by agreement with the Trustee against whom it agreed not to enforce the relief. But it obtained the relief apparently for the principal purpose of using the retroactive stay modification to bolster its position that it could disregard the July 17th Order in derogation of the interests of CHSWC, a party that the FDIC represented to the District Court had no interest in the appeal.

17th Order is final. It is not the role of this Court to review an order of its predecessor, particularly under the circumstances presented here. For purposes of the pending Disgorgement Motion, the July 17th Order remains in full force and effect, and the use of cash collateral to pay the fees of CHSWC remains authorized.

Finally, it should also be noted that, even if the District Court were to vacate the July 17th Order, it is highly questionable whether disgorgement would then be an appropriate remedy. The First Fee Application of CHSWC was granted without objection. The estate owed the fees and paid them after obtaining court approval to do so. If the approval to use cash collateral was revoked, that would not, in and of itself, change the fact that the fees were due. Rather, a remedy would need to be fashioned to compensate the FDIC for the use of its cash collateral. A punitive remedy such as case dismissal would not be appropriate, and other potential remedies such as the appointment of a trustee and the granting of stay relief have already occurred. Rather, the statutory remedies of making a cash payment or granting a replacement lien on property of the estate provide obvious solutions to make the FDIC whole. 11 U.S.C. §361.

The estate is solvent and could easily repay the FDIC if required to do so. The Trustee has over $1 million on hand; disgorgement would not be necessary to fund any payment required to be made to the FDIC.[7] A future determination by

_____

[7] The Court is aware that in the Final Cash Order, the FDIC limited its rights to collect on its retained cash collateral lien only from funds actually disgorged by CHSWC and not from the other assets of the estate. The FDIC's apparent waiver of its rights against the entity — the bankruptcy estate — that would be liable to it in the event the July 17th Order is reversed, does not change

the District Court that the FDIC's cash collateral should not have been used to pay CHSWC's fees would only change the pocket from which the estate must pay the approved fees. Under the circumstances presented here, disgorgement would not be the right method to address an unauthorized use of cash collateral. To the extent the Disgorgement Motion seeks relief on that basis, it must be denied.

### 2. Disgorgement Based on Wrongful Conduct

The Disgorgement Motion sets forth a litany of complaints about the services provided by CHSWC to the Debtor. The attorneys are charged, *inter alia*, with incompetence, conflict of interest, and breach of fiduciary duty. The threshold question before the Court is whether the FDIC has standing to raise these issues.

As the FDIC acknowledged to the District Court, the Trustee is the representative of the estate and is the person who may sue or be sued on behalf of the estate. 11 U.S.C. §323. Generally, this means that causes of action against professionals hired by the estate belong to the trustee, and the trustee has the sole authority to prosecute such claims. *See In re Stoll*, 252 B.R. 492, 495 (B.A.P. 9th Cir. 2000); *In re Herrera*, 472 B.R. 839, 845 (Bankr. D.N.M. 2012).

---

the respective rights of the parties. Disgorgement is ordered when a court determines that fees are unreasonable, and the disgorgement is then made to the entity that paid the fees, which in this case would be the Debtor's estate. 11 U.S.C. §329(b); *Matz*, 197 B.R. at 641. The proper remedy to make the FDIC whole for the use of its cash collateral, if any such remedy is called for, would be a cash payment or replacement lien provided by the estate. 11 U.S.C. §361. Nothing about the FDIC's apparent waiver of the statutory remedies changes the appropriateness of those remedies.

The FDIC claims that its right to seek disgorgement based on the alleged wrongful conduct of the Debtor's attorneys has been established through orders entered by this Court and by the order dismissing the appeal in the District Court. None of those orders, however, purport to create rights in the FDIC. Rather, the orders, at best, preserved whatever rights the FDIC actually had at the time the orders were entered. None of the orders specifically discuss standing to prosecute claims belonging to the estate. Nothing in the orders purported to create prudential standing so that the FDIC may litigate issues for the Trustee or the estate.

The FDIC also asserts that it has standing to prosecute the estate's claims because it has provided a benefit to the estate through its settlement with the Trustee. But the cases relied on by the FDIC undercut its position. The FDIC relies heavily on *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290 (7th Cir. 2003), claiming that the case says that when a creditor provides benefit to an estate, the creditor acquires standing to prosecute estate claims. But the holding in *Mellon Bank* is much more narrow. In *Mellon Bank*, the Seventh Circuit found that initial orders authorizing the use of cash collateral provided for the actual assignment of preference causes of action to secured creditors. *Id.* at 291-92. Thus, when certain preference defendants moved to dismiss adversary proceedings filed against them by secured creditors for lack of standing, the Seventh Circuit found that the preference causes of action had effectively been sold to the secured creditors, creating standing in the process. *Id.* at 292-93. *Mellon Bank* is clearly distinguishable because no orders have ever been entered assigning the estate's

rights or the Trustee's standing as it relates to the fees of CHSWC to the FDIC. The other cases relied on by the FDIC likewise involve actual sales or assignments of causes of action and provide no support for the FDIC's position. *See In re Paige*, 685 F.3d 1160 (10th Cir. 2012); *Official Comm. of Unsecured Creditors of Maxwell Newspapers, Inc. v. MacMillan, Inc. (In re Maxwell Newspapers, Inc.)*, 189 B.R. 282 (Bankr. S.D.N.Y. 1995).

The several orders entered in this case relied on by the FDIC only reserved whatever rights the FDIC had related to the fee issues and committed the Trustee to not object to the FDIC's continued participation in the case. The orders do not provide for the sale or assignment of estate causes of action and do not create standing for the FDIC where it did not already exist. Had the Trustee intended to assign or sell the estate's interest in potential causes of action against CHSWC, the Trustee would have been required to provide notice to all creditors and to have addressed any objections before making the sale or assignment. *See In re Weisser Eyecare, Inc.*, 245 B.R. 844, 848 (Bankr. N.D. Ill. 2000). Sales or assignments of estate property do not occur by implication or by side agreements with creditors. *Id*. They only occur by strict adherence to the procedural requirements set forth in the Code and Rules, and the record is clear here that there was never an assignment or sale of potential causes of action against CHSWC by the Trustee to the FDIC.

Claims for damages occurring due to malpractice and other wrongdoing by professionals that arise during a Chapter 11 case are property of the estate. 11 U.S.C. §541(a)(7); *In re Robotic Vision Systems, Inc.*, 343 B.R. 393, 398 (Bankr.

D.N.H. 2006). Random creditors cannot enforce the rights of a trustee or the estate even though an injury to the estate may cause general injury to all creditors. *Stoll*, 252 B.R. at 495-96; *Herrera*, 472 B.R. at 845. Only the trustee may pursue a cause of action belonging to the estate. *Stoll*, 252 B.R. at 495.

The FDIC says that it is not really prosecuting the potential causes of action for malpractice and breach of fiduciary duty against CHSWC. Rather, in its memorandum of law, it says that it has "merely offered facts for the Court to consider when determining if the benefit to the estate received from the services of CHSWC supports the amount of fees being sought." But this assertion is disingenuous when all other parties have proposed to settle the fee issues with CHSWC, and the FDIC is the only party seeking affirmative relief in the form of disgorgement of fees based on the alleged wrongdoing by the attorneys.

The FDIC does not have standing to assert causes of action for malpractice and breach of fiduciary duty against CHSWC. Accordingly, the FDIC is not a party with standing to raise those issues in its Disgorgement Motion. Awards of fees have a *res judicata* effect as to the conduct of the professionals involved. *See In re Ramsey*, 451 B.R. 399, 402 (Bankr. W.D. Pa. 2011). Defenses to fee requests such as lack of value in the services rendered due to malpractice, breach of fiduciary duty, or the like must be timely raised when fees are sought, or such claims may be barred. *Id.*; *see also Capital Hill Group v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 490-91 (D.C. Cir. 2009) (malpractice action barred by principles of *res judicata* due to prior fee application litigation); *Grausz v. Englander*, 321 F.3d 467, 472-73 (4th Cir. 2003) (malpractice action barred due

to identical parties' previous fee litigation); *Iannochino v. Rodolakis (In re Iannochino)*, 242 F.3d 36, 42-43 (1st Cir. 2001) (malpractice counterclaim raised regarding fee application precludes subsequent malpractice action); *Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.)*, 200 F.3d 382, 391 (5th Cir. 2000) (deliberate decision not to object to fees bars subsequent malpractice action).

Allowing the FDIC to litigate the malpractice and fiduciary duty issues with CHSWC would be inappropriate because it could preclude a later action by the Trustee or, alternatively, could result in the issues having to be litigated a second time if they are later raised by the Trustee. The FDIC's offer to just provide facts for the Court to consider is unnecessary and not helpful. The Trustee is the real party in interest with respect to evaluating the conduct of CHSWC and raising any objections to professional fees based on malpractice, breach of fiduciary duty, or similar claims. The parties acknowledge as much in the Final Cash Order, which suggests that any fees disgorged would be paid to the estate and held by the Trustee.

The Trustee may not want to seek disgorgement from or raise any complaints about CHSWC other than what he has already set forth in his objection to CHSWC's Second Fee Application. But he has not assigned or sold the estate's potential claims to the FDIC, so he alone retains both constitutional and prudential standing to bring such matters before the Court. The FDIC has not met its burden to establish that it has standing — either constitutional or prudential — to bring these causes of action. Its Disgorgement Motion based on malpractice, breach of fiduciary duty, and other alleged wrongful conduct of CHSWC must be

denied.

## C. The Second Interim Fee Application

CHSWC filed its Second Fee Application on August 22, 2013, seeking an additional $136,498.50 in fees and $2978.62 in costs. The Second Fee Application drew objections from the UST, the Trustee, the FDIC, and the Committee. Hearing on the Second Fee Application was repeatedly continued and was finally set for trial September 17, 2014. In the meantime, CHSWC filed a Motion for Final Allowance and Payment of Compensation and Reimbursement of Expenses ("Final Fee Application") requesting $40,681.50 more in fees and $1056.91 in additional costs.

Two days before the scheduled trial on the Second Fee Application, an Agreed Order was submitted by the attorneys for the UST, the Trustee, CHSWC, and the Committee resolving all issues related to the Second Fee Application and the Final Fee Application as to those parties. The parties agreed that neither the UST, the Trustee, nor the Committee would seek disgorgement of fees previously paid to CHSWC. Further, the parties agreed that CHSWC should be allowed an additional $72,021.38 in fees and $2978.62 in costs, for a total of $75,000, in full settlement of both of CHSWC's pending fee requests. CHSWC agreed to limit its total fee request to $75,000 plus the fees and costs previously paid to it. With all other parties having settled their differences, only the FDIC remained as an objector to the Second Fee Application.

The FDIC's objection to the Second Fee Application stated that the FDIC

does not consent to the use of its cash collateral for the payment of any
professional fees. The FDIC also recited the many problems which had arisen
during the pendency of the case and which resulted in the appointment of the
Trustee. The FDIC fixes blame for those problems on Attorney Clar, claiming that
Mr. Clar breached his fiduciary duties to the estate. After the entry of the Final
Cash Order, CHSWC filed a reply to the FDIC's objection, arguing that the FDIC
was no longer a party in interest as to the Second Fee Application because any
fees which might be awarded would be paid from funds which had been released
to the Trustee rather than from the FDIC's cash collateral.

Of course, when the Second Fee Application was first filed and the FDIC
raised its initial objection, the FDIC had a clear interest in protecting its cash
collateral and, therefore, undoubtedly had standing to make its objection. But
later, as CHSWC correctly points out, the FDIC and the Trustee entered into the
settlement agreement which was approved by this Court's predecessor. That
agreement provided for the sale of the North Convent property, a $4 million
guaranteed payment to the FDIC from the sale proceeds, and a split of excess
proceeds between the FDIC and the Trustee. The Sale Motion filed by the Trustee
stated that the terms of his agreement with the FDIC were that upon a successful
sale and payment to the FDIC of the agreed settlement amounts, the FDIC would
release its lien on all remaining cash collateral and waive any deficiency claim
against the estate "subject to the FDIC's reservation of interest in funds previously
paid to Debtor's counsel." The subsequently entered Sale Order provided for the
FDIC to release its liens in its cash collateral upon receipt of the settlement

payment and contained language identical to that in the Sale Motion reserving in the FDIC only its interest in "funds previously paid to Debtor's counsel[.]"

In June 2014, at the first hearing presided over by this Court, both the attorney for the FDIC and the Trustee's attorney reported that the anticipated sale was scheduled to close by the end of the month and that, thereafter, a final cash collateral order would be entered memorializing the completion of their previously approved agreement. Mr. Lipinsky, on behalf of the FDIC, specifically stated that the "only lien we will retain is in the cash that was paid to Mr. Clar's firm." At a July 2014 hearing, the parties reported that, in fact, the sale had closed and the Trustee and the FDIC would be submitting a final cash collateral order. Mr. Lipinsky noted again that the order would state that the FDIC was retaining its lien in the cash collateral used for "payments that were made to the Debtor's counsel."

The Trustee and the FDIC submitted their Final Cash Order and, because they had affirmatively represented that they were simply memorializing previously approved terms, the Final Cash Order was signed without notice and an opportunity to be heard by other parties. The Final Cash Order says that the FDIC's release excepts cash "used for payment of professional fees and expenses for Debtor's counsel." The Final Cash Order also says that the FDIC waives further claims against the estate except to the extent the Court orders disgorgement of fees and expenses paid to the Debtor's counsel. With respect to such funds ordered to be reimbursed to the estate, the Final Cash Order says that they will be held "by the Trustee pending further order of the Court."

The FDIC now argues that the Final Cash Order — in contrast to the Sale
Motion and Sale Order — did not limit the FDIC's continued interest in cash
collateral to only the funds which had been "previously" expended for the
professional fees of CHSWC. Attorney Lipinsky claims that the slightly different
language inserted in the Final Cash Order extended the rights of the FDIC to any
funds which might be "used" at any time to pay fees to the Debtor's attorneys. In
fact, he says that his interpretation constitutes the only fair reading of the Final
Cash Order. These arguments of Mr. Lipinsky and the FDIC are, however, not
credible and cannot be sustained.

At every hearing leading up to the entry of the Final Cash Order, both Mr.
Lipinsky and the Trustee's attorney assured this Court that they were proceeding
in accordance with the terms of their settlement set forth in the Sale Motion and
Sale Order. Those documents clearly limited the FDIC's rights to the funds
previously paid to CHSWC. Neither Mr. Lipinsky nor the Trustee ever suggested
in open court that they intended to modify their agreement, and neither filed any
motion or other document notifying other parties of any proposed change in
settlement terms. The Final Cash Order was tendered with the representation that
it was memorializing the completion of the previously approved settlement. If the
term "used" as it relates to cash collateral in the Final Cash Order is now to be
interpreted — as Mr. Lipinsky says it should be — to mean not only cash
"previously" used as the Sale Motion and Sale Order say but also to mean cash
which "will be used or may be used in the future," then that distinction should
have been called to the Court's attention before the Final Cash Order was

tendered.

This Court has questioned the standing of the FDIC to object to professional fees after completion of the settlement from the first time this case was before it. The stunning suggestion now by Mr. Lipinsky that this Court affirmatively approved a change in the FDIC's rights and thereby broadened its standing on pending issues without any motion being filed and without giving notice to other parties is wholly without merit. This Court signed the Final Cash Order based on its belief that Mr. Lipinsky, the Trustee, and the Trustee's attorney were acting in good faith and were, in fact, submitting an order in accordance with their express representations in open court. If Mr. Lipinsky wants to admit that he tried to slip something by the Court with the drafting of the Final Cash Order, he is free to do so. But to suggest that this Court was complicit in his actions in trying to modify the FDIC's deal with the Trustee without giving notice to interested parties is just plain wrong. In signing the Final Cash Order, this Court interpreted the language to be in full and complete harmony with the language of the Sale Motion and Sale Order and will construe the Final Cash Order only in that way.

The FDIC's position is also flawed in that it suggests that the Trustee authorized the change in the rights of the FDIC by agreeing to the entry of the Final Cash Order. The Trustee obtained authority to settle with the FDIC by filing the Sale Motion and obtaining the Sale Order. The Trustee has no independent ability to modify the Sale Order. If the Trustee desired to change his deal with the FDIC, he would have had to file a motion seeking authority to compromise and would have been required to give notice and an opportunity to be heard to

interested parties. Fed. R. Bankr. P. 9019; 11 U.S.C. §102(1). Absent such action by the Trustee — and the record is clear no such action was taken — the Trustee had no authority to enter into any further deals or settlements with the FDIC. *See Weisser Eyecare*, 245 B.R. at 848. The FDIC also points to the Settlement Letter which contains some language suggesting that the Trustee would consent to the FDIC remaining in the case to object to fees "to be paid" to CHSWC. But that precise language never made it into the Sale Motion or Sale Order and thus is not enforceable and has no bearing on the matters here. Further, the language, at best, says that the Trustee will not object to the FDIC's standing; the language does not purport to carve out an exception to the FDIC's release of cash collateral to the Trustee.

The Trustee had no authority to change his deal with the FDIC by modifying the language of the Final Cash Order from the language in the Sale Motion and Sale Order. The Court believes that the Trustee, represented by experienced bankruptcy counsel, is aware of the limits of his authority and, not unlike the Court, proceeded with the entry of the Final Cash Order in good faith and with the intent and understanding that the Final Cash Order would do no more than memorialize the completion of the previously approved settlement.

The problems with the FDIC's position were compounded by the arguments made by Attorney Lipinsky at the hearing on September 17, 2014. The Court questioned Mr. Lipinsky about how a retention by the FDIC of a cash collateral interest in fees yet to be determined or paid would work as a practical matter. The Court stated that although legal impediments existed as to the Disgorgement

Motion, the FDIC's disgorgement claim was clear: CHSWC was paid $56,000 from funds that were the FDIC's cash collateral and the FDIC wanted the money back. But it was unclear how the FDIC could release funds to the Trustee pursuant to the settlement to be used by the Trustee to pay administrative expenses and creditors and yet retain an interest in some unknown amount of those funds.

Mr. Lipinsky responded that the FDIC was entitled to compensation for staying in the case and objecting to the fees for the benefit of the estate. He asserted that if his efforts resulted in CHSWC's Second Fee Application being denied in whole or part, then the FDIC should participate in the savings achieved. But, that position makes little sense. The Trustee did not hire the FDIC or Mr. Lipinsky to fight with CHSWC about fees. And the Trustee, the UST, and the Committee are all represented by counsel capable of litigating fee issues without the help of the FDIC.[8] Additionally, there is nothing in the Sale Order or the Final Cash Order which even remotely suggests that the FDIC retained an interest in cash "not used" to pay CHSWC. Nothing in any order ever allowed the FDIC to retain an interest in cash collateral to the extent fees were requested by but never paid to CHSWC. Mr. Lipinsky's argument that the FDIC retained an interest in the cash collateral released to the Trustee to the extent funds are "not used" to pay

---

[8] Interestingly, in the Settlement Letter, the FDIC does commit to the Trustee to "assist and support" the Trustee's objections to Attorney Clar's fees "so as to enable the Trustee to structure a settlement with Scott Clar." The Trustee, the UST, and the Committee have now structured that settlement and, if finally approved, the settlement would end this expensive and contentious litigation and result in a significant reduction in the fees claimed by and awarded to CHSWC. But the FDIC is now the holdout and, contrary to its promise in the Settlement Letter, its actions are frustrating rather than supporting the Trustee's efforts to resolve the CHSWC fee issues.

CHSWC is wholly without merit.

Alternatively, Mr. Lipinsky argued that to the extent additional fees are awarded to CHSWC, the FDIC retains a lien in any funds that might be used to pay such an award. But again, the FDIC's position makes little sense. If, for example, CHSWC is awarded an additional $75,000 in fees, then according to Mr. Lipinsky, the FDIC retained a $75,000 lien on the cash released to the Trustee. But under the same theory, if CHSWC is awarded $150,000, then the FDIC has a lien for $150,000 creating, in effect, a disincentive to the FDIC to fight CHSWC. Thus, the argument does not support the FDIC's claim to have standing to object to the fees of CHSWC. If the arrangement actually exists, the FDIC would suffer no injury from any award of fees to CHSWC. To the contrary, it would benefit from any such award.

Equally important, there would never have been a benefit to the estate from the alleged arrangement, and it is unlikely that such a deal would ever have been approved if it had been disclosed. If the FDIC retained a lien equal to the amount of fees awarded, then upon the entry of any fee award, the estate would have to pay the FDIC the value of its lien and would also have to pay CHSWC the amount awarded. There is no reason why the Trustee would have agreed to make a double payment of this type. And again, if the FDIC actually is entitled to receive whatever CHSWC is awarded, then it would not be injured by any such fee award and has no standing to object to the fee request.

If the Trustee and the FDIC actually agreed to this arrangement — and the Court does not believe that they did — then the terms should have been spelled

out in the Sale Motion and Sale Order. The terms are not in those documents nor were they in the Settlement Letter. The terms recited by Mr. Lipinsky at the hearing are brand new and were asserted by the FDIC only after both the Sale Order and Final Cash Order were entered. Obviously, Mr. Lipinsky wants to stay in the litigation against CHSWC — the Settlement Letter makes that clear. But his personal desire to weigh in with his complaints about Mr. Clar and CHSWC does not create either constitutional or prudential standing for the FDIC to object to fees which may only be paid from funds in which the FDIC no longer has an interest.

Pursuant to the Sale Order and the Final Cash Order, the FDIC waived its rights in the funds retained by the Trustee after paying the settlement amounts to the FDIC. The FDIC retained, at best, its interest in its cash collateral used to pay fees to CHSWC pursuant to the July 17th Order. The FDIC has no interest in the funds now on hand in the estate from which any further award may be made to CHSWC. Accordingly, it will not be injured by any award and has not met its burden to establish either constitutional or prudential standing to be heard on the Second Fee Application. Its objection to the Second Fee Application will not be sustained.

## IV. Conclusion

The timely resolution of the matters before the Court was hampered by the fact that the record in this case is littered with repeated motions to compel, motions for sanctions, and motions to continue. Many documents in the record

have volumes of other documents attached as exhibits. The language used in many of the documents includes over-the-top rhetoric and uncivil, unsupported allegations of wrongdoing by opposing counsel. The transcripts and recordings of the many hearings are difficult to understand due to frequent interruptions by counsel of each other and this Court's predecessor. It is fair to say that neither Attorney Lipinsky nor Attorney Clar acquitted themselves in this case at the level of professionalism that this Court has a right to expect from practitioners before it. At a hearing on September 10, 2014, after the Court's initial review of the record in anticipation of the September 17th hearing, this Court told both Mr. Lipinsky and Mr. Clar that they should be embarrassed about how they had conducted themselves in this case. Regardless of the serious issues confronting each of their clients, there is simply no excuse for this case to have deteriorated in the way that it did. Nothing in this Court's most recent slog through the record while deciding the pending matters changes the Court's view. Both Mr. Lipinsky and Mr. Clar should be embarrassed by their own conduct here.

Having reviewed the record, it is clear that the FDIC's Disgorgement Motion must be denied, and its objection to the Second Fee Application of CHSWC cannot be sustained. Under the circumstances presented here, disgorgement is not the right remedy for an alleged misuse of cash collateral. If the previously authorized use of cash collateral to pay professional fees is ultimately reversed, that does not change the fact that the fees were ordered to be paid in the first place. The estate is solvent and can easily provide adequate protection to the FDIC in the form of a cash payment or replacement lien.

To the extent disgorgement is sought by the FDIC for wrongful conduct by the Debtor's attorneys, the FDIC does not have standing to prosecute those issues. The Trustee is the real party in interest as to all causes of action for alleged wrongful conduct by CHSWC and the damages, if any, from such conduct would flow to the estate, not to the FDIC. The Disgorgement Motion must be denied in its entirety.

The FDIC has waived its interest in the remaining cash in the estate. The Trustee is free to use the funds to pay administrative claims and to make distributions to unsecured creditors in accordance with statute. If the FDIC will not be injured by these other types of disbursements by the Trustee, it cannot plausibly contend that it will be injured by the Trustee making a distribution of a portion of the funds to CHSWC. The FDIC and Mr. Lipinsky, in particular, may be annoyed by any award of fees and distribution to CHSWC, but that does not result in the type of redressable injury that creates constitutional or prudential standing. The FDIC's objection to the Second Fee Application cannot be sustained.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Orders.

###